# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Integrity Dominion Funds, LLC, | **Court File No:12-254 RHK/JSM** |
| Plaintiff, | |
| vs. | |
| Lazy Deuce Capital Co., LLC;<br>Semita Partners LLC;<br>Taurus Holdings, LLC;<br>Lex Acquisition Group, LLC;<br>Brent Johnson (third-party plaintiff);<br>Brian S. Baldwin;<br>Frank W. Delahanty III (third-party plaintiff);<br>Kenneth Haglind;<br>Steve Haglind;<br>Todd Bassinger; and<br>Jeff Cahill; | **THIRD AMENDED**<br><br>**COMPLAINT** |
| Defendants; | |
| vs. | |
| Jeff Hagen; | |
| Third-party defendant. | |

Plaintiff Integrity Dominion Funds, LLC states and alleges as follows:

## **PARTIES**

1.      Integrity Dominion Funds, LLC is a Delaware LLC with its registered

office address at 7040-25 Seminole-PW Blvd., Suite 133, Loxahatchee, Florida 33470.

2.      Lazy Deuce Capital Co., LLC ("Lazy Deuce") is a Minnesota LLC doing business at all relevant times in Minnesota, with its registered office address at 1555 Southcross Dr. W., Burnsville, MN 55306.

3.      Semita Partners LLC ("Semita") is a Minnesota LLC doing business at all relevant times in Minnesota, with its registered office address at 4300 Market Pointe Dr. #310, Bloomington, MN 55435.

4.      Taurus Holdings, LLC is a Minnesota LLC doing business at all relevant times in Minnesota, with its registered office address at 1555 Southcross Dr. W., Burnsville, MN 55306.

5.      Lex Acquisition Group, LLC is a Minnesota LLC doing business at all relevant times in Minnesota, with its registered office address at 1555 Southcross Dr. W., Burnsville, MN 55306.

6.      On information and belief, Brian S. Baldwin is a Minnesota resident and is—or at relevant times was—a principal of defendants Lazy Deuce and Semita and owner of Semita and Lazy Deuce.  Baldwin's last known address is 21090 Ridgewood Trail, Lakeville, Minnesota.

7.      On information and belief, Brent Johnson is a Minnesota resident and is—or at relevant times was—a principal and owner of defendants Lazy Deuce, Taurus Holdings, and Lex Acquisition Group.  Johnson's last known address is 7785 Cress View Drive, Prior Lake, MN 55372-3809.

8.      Frank W. Delahanty III is a Minnesota resident and is—or at relevant times was—a principal of defendant Lazy Deuce and Semita and owner of Lazy Deuce and Semita.  Delahanty's last known address is 12665 Dover Dr, Saint Paul, MN 55124-8650.

9.      Kenneth Haglind is a Minnesota resident and is—or at relevant times was—CEO and owner of defendant Lazy Deuce.

10.     Steve Haglind is a Minnesota resident and is—or at relevant times was—Controller, signator, and advisor for defendant Lazy Deuce and is an employee of defendant Taurus Holdings.  Steve Haglind's last known address is 549 77th Street W, St. Paul, Minnesota 55419.

11.     Todd Bassinger is a Minnesota resident and is—or at relevant times was—chairman of the board and member of the board of advisors for defendant Lazy Deuce and an employee for various other entities owned in part by Johnson.  Bassinger's last known address is 5231 Clinton Avenue, Minneapolis, Minnesota 55419.

12.     Jeff Cahill is a Minnesota resident and is—or at relevant times was—chairman of the board and member of the board of advisors for defendant Lazy Deuce and an employee for various other entities owned in part by Johnson.

## JURISDICTION AND VENUE

13.     On information and belief, at all relevant times Defendants have resided and conducted business in Minnesota.

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367, because this action involves claims arising under the laws of the United States and other state-law claims arising out of the same case or controversy.

3

15.     Venue is proper under 28 U.S.C. § 1391.  Multiple or all defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### The false promises of Lazy Deuce

16.     Plaintiff Integrity Dominion is a small private investment fund based in Florida, founded in 2009, and operated largely by three principals—Thomas Barrett, George Bakalov, and H. Chris Poole—through a related advisory entity, Integrity Dominion Capital, LLC.

17.     Around October of 2010, Bakalov, who lives and works in Minnesota, was told about a financial opportunity by Jeff Hagen, an individual Bakalov had come to know through prayer meetings the two attended.

18.     Hagen told Bakalov about an investment company called Lazy Deuce. Hagen said that he had been able to pay all of his living expenses solely from income he had received from the investments he had made in Lazy Deuce.

19.     Hagen got Bakalov in touch with Brent Johnson, Brian Baldwin, and Frank Delahanty, who, along with Hagen, would communicate with the Integrity Dominion principals regarding Lazy Deuce.

20.     In or around October or early November 2010, Brent Johnson provided Barrett with Lazy Deuce biographical promotional materials.  **Exhibit A.**

21.     These materials describe Johnson as a "co-founder" of Lazy Deuce who

has established and successfully managed and grown many successful entrepreneurial ventures in a number of diverse fields....[including]

    a. Taurus Holdings, LLC www.taurusholdings.com which holds interests in several Law Related Companies...,

    b. LEX Recovery Group, LLC which has had gross settlements of over $100,000,000 since inception in 2006....

    c. MCM Services Group, LLC a 10 year old Legal Marketing and Advertising Company with sales of approximately $7,500,000 per annum....[and]

    d. a profitable and ever expanding Assisted Living Management and Development businesses, which operates under the Traditions of Minnesota and Iowa names. www.traditions-management.com Having entered this investment in late 2005 Mr. Johnson and his partners have ownership in and manage over $35,000,000 worth of properties and have plans on the table to construct over $50,000,000 in the next 18-24 months.

(letter formatting added)

22.    The materials also claim that "Johnson has been involved in the business of funding Attorney advertising and pre-settlement funding of Attorney settlements for the past 10 years....[and that a]verage transactions have been in the low six-figure range to the low seven-figure range."

23.    The Lazy Deuce model, the promotional materials claimed, "evolved out of the scarcity of capital for these much needed and profitable enterprises."

24.    These same promotional materials describe Baldwin as the other "co-founder" of Lazy Deuce with "extensive experience in investment banking, finance, corporate development and financial consulting" with chief duties including "creat[ing]

new business opportunities and oversee[ing] the creative and operational direction of Lazy Deuce Capital's business model."

25.     Baldwin is also described as the founder and "CEO" of Semita through which he "has successfully helped execute over 30 strategic transactions covering capitalization via equity and debt, acquisitions, restructures, joint ventures, strategic partnerships, and complex financial contracts."

26.     These same promotional materials describe Delahanty as the "Chief Compliance Officer" of Lazy Deuce who "oversees overall lending operations as well as Compliance and Risk Management."

27.     Delahanty is also described as the "co-founder and COO of Semita, a niche investment bank."

28.     Delahanty is said to possess a Bachelor of Science degree in business.

29.     These same promotional materials describe Jeff Hagen as Director of Business Development of Lazy Deuce.

30.     These same promotional materials describe Ken Haglind as Chief Executive Officer of Lazy Deuce.  The materials claim that Ken Haglind has a B.S. in accounting, an MBA in Finance, and extensive experience in the financial industry.

31.     Following initial contacts around late October of 2010, Baldwin and Johnson of Lazy Deuce had ongoing contact with Barrett and Bakalov of Integrity Dominion, and aggressively promoted lending to Lazy Deuce.

32.     In the Fall of 2010, Baldwin, with whom Bakalov and Barrett had the most contact, pitched Lazy Deuce as a company with two primary competencies.  First,

Baldwin said that Lazy Deuce made high-interest, short-term loans to companies with "exotic" collateral—the sort of hard-to-value collateral ordinary financial institutions would not touch.

33.     Baldwin claimed to be an expert in this area, and Lazy Deuce's methods of collateralizing a wide range of assets were said to be highly sophisticated and closely guarded secrets.

34.     Second, Lazy Deuce made investments to finance and profit from other people's lawsuits.  This was purportedly Johnson's expertise.

35.     Although presented as but a minor part of Lazy Deuce's overall operations, Baldwin sent Barrett an email on November 8, 2010, containing information about a loan Lazy Deuce was making to a company by the name of Dblaine Capital, LLC.  **Exhibit B.**

36.     Dblaine Capital is an investment-advisory company operated by an individual named David Blaine Welliver.  Dblaine Capital advised a mutual fund, the "Dblaine Fund," which was also organized by Welliver.

37.     A document entitled "Summary of Terms for the Loan from Lazy Deuce Capital Co., LLC to Dblaine Mutual Fund, November 1st, 2010" ("Dblaine Summary of Terms") was attached to the November 8 email to Barrett.  The document claimed that "Lazy Deuce is seeking up to 1 million dollars on behalf of Dblaine Capital in order to purchase up to 50 million in assets (1:50)."  **Exhibit C.**

38.     The Dblaine Summary of Terms claimed that Dblaine's "asset purchase" was "an SEC approved transaction."

39.     The materials emphasized collateral in a section entitled "*Guarantees*."
The Dblaine Summary of Terms said that Lazy Deuce would hold an "internal lien on the
funds [it loans to Dblaine] plus note," that Lazy Deuce "will be responsible for the
transaction start to finish," and that "Dblaine will repay the loaned funds once [Dblaine's]
asset purchase was complete...[in] approximately 90 days."

40.     The Dblaine Summary of Terms contemplated a "First Tranche, 300k 45-
90 days (Already filed with the SEC and underway); Second Tranche, 700k, 120 days."

41.     Although told by Baldwin and Johnson that some transactions with Dblaine
Capital were being pursued by Lazy Deuce (as reflected by the Dblaine Summary of
Terms), Integrity Dominion was also told that repayment of the loans it would make to
Lazy Deuce in no way would depend on the success or integrity of Lazy Deuce's
transactions with Dblaine Capital.  Dblaine Capital was presented as merely exemplary of
the many different lucrative investments Lazy Deuce pursued.

42.     Johnson and Baldwin also told Barrett and Bakalov that Lazy Deuce's
lending to Dblaine was additionally collateralized against Dblaine Capital's proprietary
investment model, which was said to have been appraised at $7 million dollars by itself.

43.     Based on the representations of Lazy Deuce and its principals, on or around
November 12, 2010, Integrity Dominion loaned Lazy Deuce $50,000 for a 90-day term at
5% interest per month.

44.     Around early December, 2010, soon after Integrity Dominion made its first
loans to Lazy Deuce, Bakalov was invited to visit Lazy Deuce's offices in the first floor
of an office building located at 1555 Southcross Dr. W., Burnsville, MN 55306.  Lazy

Deuce's office space was impressive and the presentation made by Baldwin and outward appearances made it appear to Bakalov that Lazy Deuce was well-funded and professionally operated.

45.     Baldwin and Johnson claimed the entire office building was owned by Johnson.

46.     Also that winter, Johnson took Barrett and Bakalov to his home to make further show of his personal wealth as the "main backer" of Lazy Deuce.  Johnson claimed his home was worth $8 million and mortgage free.  He showed Barrett and Bakalov valuable art, silver and gold, and vaults in his basement, in which he claimed he would soon secret even larger volumes of gold and silver bullion and precious gems that were currently in his bank accounts.

47.     Johnson also claimed that he controlled much of this wealth not in his own name.  As a result, he said that if he got divorced, his wife would get very little of his wealth.

48.     On January 31, 2011, Baldwin emailed to Delahanty two "term sheets" Delahanty was instructed to "use...at [his] discretion."  Johnson, Hagen, Lazy Deuce CEO Ken Haglind, and Bakalov were CCed on this email.

49.     One term sheet promoted investment in a "25 Million Preferred Offering" by Lazy Deuce.  **Exhibit D.**

50.     It claims that "Lazy Deuce creates workable, sometimes unique, solutions for companies and individuals seeking liquidity," for whom "traditional" lending is not available.

51.     The term sheet explains that Lazy Deuce provides such loans "oftentimes collateralized by assets which might not merit conventional financing," and provides what are said to be:

> only a few examples of [w]hat Lazy Deuce Capital considers as collateral when funding loans:
>
> - Leveraged M&A
> - Legal Settlement Advances
> - Private Company Stock
> - Limited Partnership Interests
> - Real Estate (Commercial, Residential, Rental or Farmland)
> - Precious Metals (Gold, Platinum or Silver)

52.     The term sheet boasts that "Lazy Deuce is providing loans to entrepreneurs and businesses worldwide" and "[w]ithin 3 years...plans to provide 100 million dollars in business loans."  It further boasts of a "state of the art web-based platform" and promises that "we conservatively project revenues approaching 60 million."

53.     The term sheet lists Boulay, Heutmaker, Zibell & Co. as Lazy Deuce's auditor and Gray Plant Mooty as its legal counsel.

54.     The second term sheet was very similar, but claimed to be for a $700,000 "Funding Opportunity" instead of being a "25 Million Preferred Offering," indicated 3% instead of 3.5% interest, and projected only "revenues approaching 20 million" instead of 60 million.  **Exhibit E.**

55.     As also indicated by the term sheets and the biographical promotional materials, Johnson told Barrett that Lazy Deuce did a lot of investing in other people's legal claims.  In January of 2011, at a lunch in Sarasota, FL, Johnson showed Barrett a 2-

inch thick red binder containing what Johnson claimed were numerous legal cases in which Lazy Deuce was investing.  Johnson claimed that the majority of Lazy Deuce's investments were in such legal claims.

56.     Following on-time repayments of the initial short-term loans to Lazy Deuce and continued representations of the sort discussed above, several other similar short-term, high-interest loans from Integrity Dominion followed that winter and in the spring of 2011, in principal amounts ranging from $100,000 to $700,000.

57.     These loans are summarized in the table below, showing the date the loan was made, the principal amount of the loan, the number of days until the principal and interest came due, and the monthly interest rate on the loan.  The bolded, underlined loans are those on which Lazy Deuce would later default (true and correct copies of the promissory notes memorializing these loans are attached as **Exhibits F, G, and H**):

| Date | Principal | Days until due | Int.% |
|---|---|---|---|
| 11/12/10 | $50,000 | 90 | 5.00% |
| 11/23/10 | $100,000 | 30 | 10.00% |
| 11/30/10 | $350,000 | 30 | 7.50% |
| 01/13/11 | $200,000 | 90 | 3.50% |
| 02/01/11 | $250,000 | 90 | 3.50% |
| 02/15/11 | $100,000 | 90 | 3.50% |
| 02/15/11 | $200,000 | 60 | 3.50% |
| 03/16/11 | $100,000 | 30 | 3.50% |
| **03/28/11** | **$200,000** | **90** | **3.50%** |
| 04/21/11 | $500,000 | 30 | 4.00% |
| **04/21/11** | **$700,000** | **90** | **4.00%** |
| 04/28/11 | $250,000 | 30 | 3.50% |
| **05/26/11** | **$600,000** | **30** | **4.00%** |

58.     The first three loans in the table above were signed by Delahanty on behalf of Lazy Deuce, and at the request of Barrett, subsequent loans were cosigned by Delahanty and Kenneth Haglind.

59.     While Integrity Dominion was lending to Lazy Deuce, Barrett asked Johnson how it was profitable for Lazy Deuce to take out loans at the high rates at which Integrity Dominion was loaning it money.  Johnson replied that Lazy Deuce was able to turn around and re-lend the money at rates of about 5% per month, and specifically referenced Lazy Deuce's transactions with Dblaine as an example.

60.     In early 2011, Barrett inquired through Hagen about a lawsuit in which Baldwin and Delahanty had been named as defendants in 2008, along with a company they operated named Bright Dominion LLC.

61.     Baldwin claimed, in a January 11 email to Barrett copied to Delahanty, that "The whole deal was quite the odyssey...[but] the case was dismissed, and settled out of court" for what Baldwin described as a confidential amount.

62.     In a reply to all, Barrett asked Baldwin and Delahanty to further clarify the response: "In other words, you came out ahead on the whole deal....your company was vindicated.  Would this be a correct characterization[?]"

63.     Baldwin replied, "correct," and went on to briefly summarize terms of a settlement agreement which he claimed were confidential.

64.     Baldwin claimed in these emails that the case merely involved a "referral fee" that they received from the plaintiff in the case as a result of an "indirect referral."

12

65.     Unknown to Barrett and unrevealed by Baldwin and Delahanty, the plaintiff's complaint in the Bright Dominion lawsuit, United States District Court for the District of Massachusetts case 1:08-cv-12058-JLT, alleged that Baldwin, Delahanty, and their company, Bright Dominion, knowingly used forged bank documents and committed other misdeeds pursuant to a "scheme to defraud" the plaintiff out of over $1 million dollars.

66.     The principals and agents of Lazy Deuce and Integrity Dominion had several oral conversations during the period of their lending relationship in which Baldwin and Johnson reiterated and reemphasized the depth and breadth of their operations and the overriding safety of Lazy Deuce's lending and investments.

67.     One such meeting, exemplary of such conversations, took place on March 10, 2011, between Barrett and Bakalov from Integrity Dominion and Baldwin, Johnson, Delahanty, and Hagen from Lazy Deuce.  The meeting was recorded by Bakalov.

68.     Barrett explained that he wanted to make sure that Integrity Dominion did not need to worry about whether or not Dblaine defaulted.  Barrett said:

> Frank [Delahanty] just used [Dblaine] as an example, I am not loaning money to Dblaine, I am loaning money to you. So I loaned it to you. Let's say that Dblaine defaults, obviously you're going to say "It wouldn't default" and so on and uh you have security with Dblaine if it did and if worse case happens, whatever, what is my security with you exactly?
>
> ****
>
> Ultimately, if things fall apart, whatever, I am looking to you, I don't want to be doing a look through to Dblaine in anyway because then I have to look at their financials.
> I just want to know that you guys have the capability totally independent of Dblaine or anyone else.

****

I don't want to have to worry about whether you guys have done your due diligence and I just want to assume that you have and that you guys will have the capability to pay me back whether or not everyone else pays you back.

69.     Baldwin responded, claiming that (1) unlike a pass-through entity Lazy Deuce had a pool of funds; (2) that they operate on a "loan-utilization curve" through which they operate very profitably loaning out only half of their money at a time; (3) Lazy Deuce's lenders would not have to wait for the liquidation of collateral to get paid in the case of a default; (4) that in the case of loans to Dblaine in particular, Integrity Dominion did not need to worry about default because Dblaine posted $2 million in assets on which Lazy Deuce had a first lien; and (5) that Lazy Deuce would "just pay" Integrity Dominion in the case of Dblaine default.  Specifically, Baldwin said:

> Yeah I mean, we have a loan of utilization rate too, I mean we don't, like, one dollar goes in one dollar goes out.  It's not a pass through its more of a pooling.
>
> ****
>
> So we don't loan everything out, and our loans are in a box of $100 to $500 grand, sweet spot is generally $250, its three months-ish, a lot times people pay them off as soon as they can to stop the clock a lot of the time, but you know, so we have a loan utilization curve too where we are extremely profitable at loaning half our money as you can imagine. So, what happens in the case of $100K, and you don't want to wait, yeah we don't make you wait for the dispensing of the asset, we just pay you, like we talked about.
>
> We just might portfolio that, as a matter of fact everything single one of these things that I did, yeah that would be nice, ---- Dblaine, they post $2 million dollar assets that are in reserve on their fund just like a broker a BD, just like all these other institutions, we got a first lien on their assets, so if they default on a $100,000 loan they've got a pool of cash sitting there in

14

jeopardy and their license that can be cashed by us, we know, we just pay you the $100 grand.

70.     Barrett then asked: "My question is really simple:  What is my risk?  Am I at risk at all?"

71.     Johnson responded, assuring Barrett (1) that Lazy Deuce always gets collateral worth substantially more than what it lends out and (2) that Delahanty ensures the compliance of Lazy Deuce's lending activity.  Specifically, Johnson said:

> Your risk is that we are not good underwriters and we don't have good compliance, Frank's our compliance director.  That we don't have good compliance, that we're lending money to yahoo's with no collateral blah blah blah.  Anything we do we pile the collateral.  If we loan a guy 100,000 we get 250 in collateral.  So if it doesn't work out we can still liquidate it and get the money.

72.     Baldwin continued, claiming (1) that Lazy Deuce's lenders are not particularly tied to any specific transaction by Lazy Deuce; (2) that Lazy Deuce's lenders do not need to even know about particular defaults on loans Lazy Deuce makes because Lazy Deuce will just pay their lenders back either way; (3) that Lazy Deuce has a pool of cash that they never fully utilize to pay back their lenders; and (4) that Lazy Deuce has about 29-30 different investments or loans out at the time at values around $100,000 to $200,000.  Specifically, Baldwin said:

> [I]t's a pool of cash, we have a pool of cash that we lend and to illuminate the situation on the Dblaine thing, we make them aware of it, but you know simply our investors if there is a default they never even have to know about it because it's not directly tied to any specific thing.  That's *our* issue.
>
> We have a pool of cash and you get your money back because we don't utilize all of our cash.  We never invest in one thing, and how many things do we have out now, 29-30? So and they are 100,000, 200,000 these types of things, so long short of it, if it defaults we just pay you and you don't

even know, we aren't going to call you and tell you something defaulted, you could care less, it's just our portfolio.

73.    Delahanty added that "We also just this quarter completed an audit a major account firm in the Twin Cities and in part of the audit required a reserve account."

74.    Barrett continued:

Where I am coming from is you know a lot of our investors are churches, ministries, retired people, etc., so are they at risk, so do you see any scenario under which they might not get their money back because it's not my money?

75.    Barrett made sure to make eye contact with all of Johnson, Baldwin, and Delahanty as he was saying this to elicit a response from each of them.

76.    Delahanty and Johnson audibly said "No."

77.    Delahanty elaborated, claiming that there was no scenario under which Integrity Dominion would not get its money back because "We are really collateralled...we're two to three times collateral, overcollateralized."

78.    Johnson elaborated further, claiming (1) that Lazy Deuce had gotten collateral in gold on one investment and (2) they Lazy Deuce made sure they always had multiples of their investments in collateral so they have upside in the case of default. Specifically, Johnson said:

And the loans are such short terms that, this guy gave us gold to put up for collateral is gold going to drop 60-70% in three month period? No, it might drop 5% or 7% if it drops at all so everything is short term.  And the good news is we are not FDIC insured we are not counting on anyone else bailing us out, We know that we are on the hook for it, we want to make sure that I've got 300,000 to loan 100.  Because if the guy defaults, we want some upside.

79.     Delahanty continued, claiming that Lazy Deuce "took 1600 cases [from an attorney] for collateral of $100,000."

80.     Johnson chimed in, "I mean we were probably overcollateralized by a factor of 1000."

81.     Delahanty claimed that all the Lazy Deuce representatives in the room were initial investors in the company and asked their friends and family for money to get started.

82.     Baldwin claimed that he and Delahanty had been working together in similar ventures since 2005.

83.     Delahanty claimed that Johnson "has been doing it for 100 years."

84.     Johnson further claimed (1) that Lazy Deuce had been involved in a Converse tennis shoes bankruptcy claim turned a $10,000 investment into $600,000; (2) that Lazy Deuce was looking at doing a similar deal soon with similar rate of return; and (3) that such deals are typical of what Lazy Deuce does.  Specifically, Johnson said:

> we just did one last year that 10,000 turned into 600,000.  We bought a bankruptcy claim on Converse tennis shoes for 10 grand and turned it into 600 grand.  We had our own 10 grand we paid all of it, okay.  And we're doing a 30/70 split on that where Lazy Deuce will get 30% of the win, we're standing behind it, they get their money off the top, and then 30% to chop that up for some of the guys that put in money.  The one we're looking at is going to be similar to that, 10 will get you 600.  That's the kind of stuff we do, but it's nothing  you can read about in the text book or really feel totally comfortable about, its, but there's huge leverage and everybody makes money.

85.     The assurances and claims made at the March 10 meeting by Lazy Deuce's principals were exemplary of similar such assurances and claims made to Barrett and

Bakalov primarily by Baldwin and Johnson in various oral conversations over the course of the Integrity Dominion's lending relationship with Lazy Deuce.

86.     In such conversations with Barrett and Bakalov, Baldwin and Johnson repeated the theme that they actually *hoped* that Lazy Deuce's borrowers would default since default would allow Lazy Deuce to claim the supposedly ample collateral it possessed.

87.     Such assurances and claims were instrumental in Integrity Dominion's decision to begin lending to Lazy Deuce and to continue lending, both before and after the March 10, 2011 meeting.

88.     In particular, the above-described claims by Lazy Deuce's principals at the March 10 meeting were instrumental in Integrity Dominion's decision to makes the loans upon which Lazy Deuce would later default.

**Lazy Deuce defaults and its frauds are exposed**

89.     As it turned out, many of the critical representations Defendants made about themselves and Lazy Deuce were false.

90.     After the March 10, 2011 meeting, Integrity Dominion made $2,350,000 in additional short-term loans to Lazy Deuce, and by mid-summer Lazy Deuce had defaulted on over $1,500,000 in payments.

91.     On information and belief, Lazy Deuce did not have a "pool" of reserve funds as Defendants had claimed.

92.     Moreover, Lazy Deuce was a "pass through," in the sense that it tied funds from its lenders, such as Lazy Deuce, directly with its borrowers, such as Dblaine.  Each

such lender/borrower transaction was effectively self-contained, such that Lazy Deuce's lenders would not benefit from any solvency or profit Lazy Deuce derived from other transactions.

93.     Lazy Deuce did not have collateral or security interests, as Defendants had claimed, in Dblaine and in numerous other investments, let alone the ample collateral they claimed.

94.     Lazy Deuce had not completed an audit with a major accounting firm, as claimed.

95.     Dblaine Capital was not purchasing "50 million in assets" with $1 million, as claimed.  In fact, it was merging with two particular other funds, with combined assets of less than $10 million.  Moreover, this was the amount that the other funds had under management, not an amount of "assets" that Dblaine Capital would own after purchasing.

96.     Moreover, Dblaine Capital did not give Lazy Deuce an "internal lien" on the funds as claimed and Lazy Deuce did not get any security interest in Dblaine Capital's investment model.

97.     Lazy Deuce had not invested in numerous lawsuits as described by Johnson, including the Converse bankruptcy claim.

98.     In fact, to the extent such claims had basis in reality, Johnson had represented that the operations of other entities he controlled, defendants Lex Acquisitions Group and Taurus Holdings, had actually been the operations of Lazy Deuce.  Johnson is a principal and agent for Lex Acquisitions Group and Taurus Holdings.

99.     Lazy Deuce did not have investments secured by gold, as claimed.

100.    Contrary to representations of varied and numerous lucrative investments, almost all of Lazy Deuce's funds at any given time were tied up with Dblaine Capital in a investment scheme currently the subject of an SEC lawsuit—SEC v. Welliver and Dblaine Capital, LLC, 0:11-cv-03076-RHK-SER—against Dblaine Capital and its principal Welliver.

101.    Such transactions that Lazy Deuce did pursue aside from the Dblaine transaction were largely "insider" deals between entities or individuals closely associated with Johnson and designed to benefit those entities and individuals.

102.    Contrary to representations, Lazy Deuce's lending to Dblaine Capital was a direct and almost immediate pass-through of its borrowing from Integrity Dominion.

103.    Moreover, Lazy Deuce was borrowing from Integrity Dominion and a few other smaller lenders at rates around 3% to 4% per *month* and then turning that money around and lending it to Dblaine at 15% to 18% *annual* interest—less than 1.5% monthly interest.  A true and correct copy of a promissory note between Lazy Deuce and Dblaine Capital is attached as **Exhibit I**.

104.    This was an obviously unsustainable strategy and contrary to Johnson's representation that Lazy Deuce was getting around 5% monthly interest from Dblaine Capital and from its investments generally.

105.    But, on information and belief, Defendants were not interested in a sustainable strategy and knew that Lazy Deuce did not have a plausible money-making strategy.

106.    *All* the interest payments on Lazy Deuce's loans to Dblaine Capital came due in the first three months, even though the loan terms were for a full year, allowing Lazy Deuce to maintain, in the short-term, the facade that it was getting very high monthly interest payments during those initial months.

107.    In addition, as admitted by Delahanty, Baldwin, and Ken Haglind in deposition testimony, as a condition of its loans to Dblaine Capital, Lazy Deuce was requiring Dblaine Capital to make a quid-pro-quo investment of Dblaine Fund's money into defendant Semita.  Excerpts of deposition testimony from the SEC v. Welliver and DBlaine Capital case from Delahanty, Baldwin, and Ken Haglind are attached as **Exhibit J.**

108.    Semita was formed in August of 2010—around the same time Lazy Deuce was formed—by several principals and agents of Lazy Deuce: Baldwin, Hagen, and Delahanty.

109.    As admitted by Delahanty, Baldwin, and Ken Haglind in deposition testimony, Semita had no actual operations and served only as a pass-through to Lazy Deuce.

110.    Semita's only purpose was to allow the parties to the transaction to maintain the facade that Dblaine Capital was not causing Dblaine Fund to make investments in a company that was providing Dblaine Capital with loans—which was an obvious conflict of interest for Welliver and Dblaine Capital.

111.    The arrangement on the whole was a Ponzi scheme.  Lazy Deuce borrowed money at high rates from Integrity Dominion and a few others on 30-to-90-day notes, lent

it at much lower rates to Dblaine Capital on year-long notes, and then could only repay its short-term borrowers if Welliver arranged to have Dblaine Fund make corresponding new investments in Semita before the short-term notes were due.  Semita simply passed such investment funds through to Lazy Deuce so that Lazy Deuce could repay its loans.

112.   At certain times, when use of the Dblaine Fund's money was impracticable to continue the Ponzi scheme, Dblaine Capital *itself* reinvested the money it borrowed from Lazy Deuce into ownership interests Semita, which in turn passed that money right back to Lazy Deuce again so that it could, at least in the short term, repay its lenders and keep the scheme going.

113.   Adding to the financial absurdity of the Dblaine transactions from Lazy Deuce's perspective is the fact that Dblaine Fund's investments in Semita (which again, were simply passed on to Lazy Deuce) were to have been "preferred" and to have earned a regular rate of interest themselves—about 10%.  So Lazy Deuce's ultimate cost of lending to Dblaine Capital at rates around 15% per year was borrowing money from Integrity Dominion at rates of 36% to 48% per year *plus* the additional cost of the roughly 10% that Dblaine Fund's investments were purportedly to have earned.

114.   The Dblaine transactions were a money-losing machine for Lazy Deuce and they kept Lazy Deuce's finances in a perpetual state of insolvency.  A document provided to Lazy Deuce's auditors around February 2011 summarizes how Lazy Deuce's borrowing was at very high rates and lending activity was at far lower rates, resulting in no hope of profitability, and is attached as **Exhibit K.**

115.    This scheme, obviously unsustainable without continuous new investment from the Fund, fell apart in June 2011 when Welliver was unwilling or unable to continue directing the corresponding investment in Semita with the Dblaine Fund's money when Lazy Deuce loaned money to Dblaine Capital.

116.    With the flow of investments from Dblaine Fund (and occasionally Dblaine Capital) through Semita halted, Lazy Deuce defaulted on the three loans from Integrity Dominion in principal amounts totaling $1.5 million.

### Defendants wrongfully benefited from the Lazy Deuce scheme

117.    The fact that Semita had no operations did not stop Baldwin from using the company as his personal credit card as funds passed through it.  In what Kenneth Haglind describes as an "unresolved discrepancy" that Steve Haglind, Johnson, and Delahanty knew about by at least the spring of 2011, Baldwin took $125,000 out of Semita for himself that was never passed on to Lazy Deuce and never repaid.

118.    Johnson took a personal loan of $100,000 from Lazy Deuce, which was later forgiven, despite the fact that the loan was both taken and forgiven while Lazy Deuce was insolvent and unable to pay its creditors.

119.    Lazy Deuce was also used to conduct a variety of transactions benefiting several of Johnson's other companies, in which Steve Haglind, Bassinger, and Cahill were involved.

120.    Kenneth Haglind and Baldwin both took salaries that were unreasonable given the two companies existed primarily to perpetuate a Ponzi scheme and had no hope at any time of profitable operations.

121.    On information and belief, Defendants would have continued perpetuating the Ponzi scheme for much longer and taken additional wrongful gain for themselves had Welliver not chosen or been forced to ceasing investing Dblaine Fund's money into the scheme.

**The essential elements of the Ponzi scheme were widely understood at Lazy Deuce**

122.    Ken Haglind, Brian Baldwin, and Frank Delahanty all admit in deposition testimony that they knew the essential elements of the Lazy Deuce-Dblaine scheme described in the immediately preceding paragraphs.

123.    In fact, Delahanty testified that himself, Johnson, Kenneth Haglind, Todd Bassinger, Steve Haglind, and Jeff Cahill all knew about the essential elements of the Lazy Deuce-Dblaine scheme and discussed the scheme's structure on "[m]ultiple occasions" going back to at least October or November of 2010, including a meeting in January 2011.

124.    Cahill and Bassinger are attorneys who worked closely with Johnson and with various companies owned and/or controlled primarily by Johnson either directly or indirectly, and both contributed as members of Lazy Deuce's Board of Advisors/Directors and decision makers for Lazy Deuce.

125.    Bassinger was also the chairman of the Lazy Deuce Board, helped form the Lazy Deuce entity, and helped prepare documents memorializing the Semita-to-Lazy Deuce pass-through transactions

126.   Steve Haglind was a "Controller" of Taurus Holdings, and also acted as "Controller" and authorized signor for Lazy Deuce.  As Controller, on information and belief, he had duties similar to those of a Chief Financial Officer.

127.   Kenneth Haglind testified that around the spring of 2011 he discussed the structure of the Dblaine Capital scheme and the pointlessness of Semita's involvement with Steve Haglind, Bassinger, Cahill, and Johnson.

128.   According to Delahanty, repaying Lazy Deuce's short-term lenders with quid-pro-quo investment funds that Welliver directed from Dblaine Fund into Semita was "the whole basis of the loan[s from Lazy Deuce to Dblaine Capital]."

129.   Baldwin testified that Kenneth Haglind, Steve Haglind and Delahanty arranged with Welliver to figure out a "computation...relat[ing] to...what it took for [Lazy Deuce] to get a lender to lend to us," and that such figure would be the amount that Welliver directed the Dblaine Fund to invest in Semita to be passed through to Lazy Deuce in exchange for Lazy Deuce's long-term loans to Welliver.

130.   Numerous Lazy Deuce emails support this close relationship.  Kenneth Haglind, Steve Haglind, Baldwin, and Delahanty arranged via email and other means with Welliver and his agents to coordinate the amounts and timing of quid-pro-quo investment such that Lazy Deuce could repay its lenders and maintain the facade of profitability and a plausible business model.  An example of such emails is attached as **Exhibit L**.

131.    According to Baldwin's testimony, such coordination was often on "a day-by-day, hour-by-hour" basis between Lazy Deuce's and Dblaine Capital's representatives.

132.    Several Lazy Deuce Board meeting minutes support Delahanty's testimony that the structure of the investment scheme, its essential Ponzi-scheme elements, and its ongoing mechanics were well-known within Lazy Deuce as the scheme operated.  An example of such meeting minutes **is attached as Exhibit M.**

133.    These meetings were regularly attended by Baldwin, Johnson, Delahanty, Hagen, Ken Haglind, and Bassinger.  Copies of the minutes were also distributed for review and approval to all attendees and to those who were intended to participate in the meetings, but did not, including Cahill and Steve Haglind who were not present at all such meetings.

134.    According to testimony by Baldwin and Delahanty, Lazy Deuce was governed by an "advisory board" or "board of directors"—which on information and belief refer to the same thing—consisting of at least Baldwin, Johnson, Cahill, and Bassinger.

135.    In addition, Lazy Deuce had "Weekly Operating Meetings," as reflected in the meeting minutes referenced above, which were attended by a wider group, including all named individual defendants in this lawsuit.  The decisions and deliberations of both groups had a substantial impact on the operation of Lazy Deuce and its scheme against Integrity Dominion.

136.    Delahanty and Baldwin also learned in early March, 2011, that Welliver had a federal criminal judgment against him in the amount of almost $20 million.  Lazy Deuce did not disclose this information to Integrity Dominion.

### Early development of the Lazy Deuce/Dblaine scheme

137.    The nature of the scheme began to take shape around the early fall of 2010, as at which point Bassinger and Baldwin produced a draft letter agreement between Lazy Deuce and Dblaine Capital that explicitly proposed the scheme's essential Ponzi-scheme elements, including the timed quid-pro-quo investments by Dblaine Fund that would allow Lazy Deuce to repay its lenders.

138.    Johnson was kept informed of the progress of the negotiations, including being copied on emails of drafts and discussions between Bassinger and Baldwin.

139.    This draft letter agreement was sent to Welliver and would always represent the true nature of the agreement, but the language of the final agreement ultimately signed was changed at the behest of Welliver's advisors, such that the quid-pro-quo nature of the scheme and Welliver's directing of Dblaine Fund's assets to Lazy Deuce— the clear conflict of interest—was obscured.

140.    Delahanty and Baldwin testify that this change in the language did not alter the true nature of the deal, as was originally reflected in the draft letter agreement.

141.    Moreover, Baldwin testifies that Bassinger advised him that Semita could be inserted as an empty pass-through entity to give the appearance that Dblaine Fund was not investing directly in Lazy Deuce, even though that was the intent and the practical effect.  Bassinger said that this sort of thing was done all the time.

27

**Activities after Lazy Deuce's default**

142.    When ultimately confronted by Barrett and Bakalov after Lazy Deuce defaulted on Integrity Dominion's loans, Johnson attempted to justify all of Semita's and Lazy Deuce's transactions as legitimate because they were approved by those companies' compliance officer—Delahanty—and others.

143.    The principal amount of Integrity Dominion's loans in default is $1.5 million, none of which Lazy Deuce has paid.  In addition, $129,000 in interest was due on the loans at the times of their maturity, of which only $35,000 was paid.  Additional interest has accrued since.

144.    Shortly before Lazy Deuce defaulted on its loans from Integrity Dominion, Johnson represented that Baldwin had needed to leave Lazy Deuce due to personal problems involving alcoholism and other issues.

145.    In fact, on information and belief, almost immediately after supposedly leaving Lazy Deuce, Baldwin started another investment company called "Stone Path Financial," the website of which was highly duplicative of Lazy Deuce's website and claimed to be "powered by Lazy Deuce Development Company" and copyrighted by Lazy Deuce.

146.    After Lazy Deuce defaulted in the summer of 2011, Delahanty and Hagen continued to operate similar pass-through lending transactions for one of Lazy Deuce's former borrowers through a company called "Skyhawk Companies, LLC."

**The Corporate Entities were Mere Facades for the Individuals' Scheme**

147.   On information and belief, corporate defendants Lazy Deuce and Semita were mere facades used for the purpose of defrauding Integrity Dominion by eliciting large amounts of lending based upon the above-described false promises in a Ponzi scheme Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill knew was designed to profit themselves at the expense of Integrity Dominion, and then directing such money to further their scheme without regard to obligations of the corporate forms.

148.   Similarly, Johnson, Baldwin, and others represented that the investment activities of Taurus Holdings and Lex Acquisitions Group were actually the activities of Lazy Deuce, in order to induce investment in Lazy Deuce.

149.   On information and belief and as described herein, Lazy Deuce and Semita: (a) were insufficiently capitalized for purposes of their corporate undertakings; (b) failed to observe corporate formalities; (c) became insolvent at pertinent times in question;(d) acted as conduits for the siphoning of funds by their principals, including Johnson and Baldwin; (e) had nonfunctioning officers and directors; (f) failed to maintain adequate corporate records; and (g) existed merely as facades for the individual dealings and schemes of their principals, including Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill.

150.   Lazy Deuce and Semita were used as tools for the fraudulent Ponzi scheme of Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill and it would therefore be fundamentally unfair and unjust to permit the individuals the protection of the corporate forms.

151.    Moreover, because the activities of Taurus Holdings and Lex Acquisitions Group were presented by Johnson as those of Lazy Deuce in flagrant disregard for the corporate form, it would therefore be fundamentally unfair and unjust to permit Taurus Holdings and Lex Acquisitions the protection of Lazy Deuce's corporate form.

### The Defendants Assisted each other in a Common Scheme

152.    As described specifically in this complaint, Baldwin, Johnson, and Delahanty made false representations to induce lending to Lazy Deuce or, knowing of such statements and their falsity, and having a duty to disclose, failed to disclose.

153.    Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill all knew that Lazy Deuce's transactions with Integrity Dominion, the Dblaine entities, and Semita had the structure and effect of a Ponzi scheme, designed to benefit these individuals at the expense of Integrity Dominion.

### CLAIM I –Breach of contract
### against All Defendants

154.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

155.    **Lazy Deuce** entered into contracts with Plaintiff by which Lazy Deuce borrowed money from Plaintiff.

156.    **Lazy Deuce** breached its contracts with Plaintiff by failing to pay Plaintiff the money owed under the contracts in the total amount of $1.5 million prior to the calculation of applicable interest.

157.    **Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill** share individual liability for this breach, because Lazy Deuce is a mere facade for their fraudulent scheme, meriting piercing of the corporate veil for the reasons described in additional detail above.

158.    Moreover, because the activities of **Taurus Holdings and Lex Acquisitions Group** were presented by Johnson as those of Lazy Deuce in flagrant disregard for the corporate form, it would therefore be fundamentally unfair and unjust to permit Taurus Holdings and Lex Acquisitions the protection of Lazy Deuce's corporate form, meriting piercing of the corporate veil against Taurus Holdings and Lex Acquisitions Group.

159.    Accordingly, all Defendants have caused harm and are liable to Plaintiff in the amount of at least $75,000, in an amount to be determined at trial, plus legal costs and fees, as allowed by law.

**CLAIM II—Fraudulent misrepresentation**
**against Lazy Deuce, Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind,**
**Todd Bassinger, and Jeff Cahill**

160.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

161.    **Baldwin** made the false statements of past or existing material fact susceptible of knowledge regarding Lazy Deuce and its investment activities described in paragraphs 37, 39, 41-42, 52, 63, 69, 72, and 85 and made such statements knowing they were false or without knowing whether they were true.

162.  **Johnson** made the false statements of past or existing material fact susceptible of knowledge regarding Lazy Deuce and its investment activities described in paragraphs 41-42, 59, 61, 78, 80, and 84-85 and made such statements knowing they were false or without knowing whether they were true.

163.  **Delahanty** made the false statements of past or existing material fact susceptible of knowledge regarding Lazy Deuce and its investment activities described in paragraphs 73, 76, 77, and 79 and made such statements knowing they were false or without knowing whether they were true.

164.  **Lazy Deuce** made the false statements of past or existing material fact susceptible of knowledge regarding Lazy Deuce and its investment activities described in paragraphs 37, 39, and 52 and made such statements knowing they were false or without knowing whether they were true.

165.  The above-referenced false statements are false as described in paragraphs 89-116.

166.  **Baldwin (fraud by omission)**, as cofounder of Lazy Deuce with duties including "creat[ing] new business opportunities and oversee[ing] the creative and operational direction of Lazy Deuce Capital's business model" and as cofounder and CEO of Semita, knew that the statements described in paragraphs 162-164, regarding the fundamental nature of Lazy Deuce and its investment activities, were false.

167.  Because of his prominent role in Lazy Deuce and Semita, because he was present at the March 10 meeting, and because he was engaged in a common scheme with the other Defendants to defraud Integrity Dominion, Baldwin knew that such false

statements were being communicated to Integrity Dominion through Barrett and Bakalov and relied upon by them.

168.     Baldwin thus had special knowledge of material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

169.     As a cofounder, co-owner, and key high-level decision-maker for Lazy Deuce, Baldwin had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

170.     For these reasons, Baldwin had a special duty to disclose the falsity of such statements.

171.     He did not.

172.     **Johnson (fraud by omission)**, as Lazy Deuce's cofounder whose expertise in investing in others' legal claims was claimed to have been fundamental to the majority of Lazy Deuce's business and its creation, knew that the statements described in paragraphs 161 and 163-165 regarding the fundamental nature of Lazy Deuce and its investment activities, were false.

173.     Because of his prominent role in Lazy Deuce, because he was present at the March 10 meeting, and because he was engaged in a common scheme with the other Defendants to defraud Integrity Dominion, Johnson knew that such false statements were being communicated to Integrity Dominion through Barrett and Bakalov and relied upon by them.

174.     Johnson thus had special knowledge of material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

175.    As a cofounder, co-owner, board member, and key high-level decision-maker for Lazy Deuce, Johnson had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

176.    For these reasons, Johnson had a special duty to disclose the falsity of such statements.

177.    He did not.

178.    **Delahanty (fraud by omission)**, as Chief Compliance Officer of Lazy Deuce, as an initial investor in Lazy Deuce, as the co-founder and COO of Semita, and as the individual who "oversees [Lazy Deuce's] overall lending operations as well as Compliance and Risk Management," knew that the statements described in paragraphs 161-162 and 164 regarding the fundamental nature of Lazy Deuce and its investment activities, were false.

179.    Because of his prominent role in Lazy Deuce and Semita, because he was present at the March 10 meeting, and because he was engaged in a common scheme with the other Defendants to defraud Integrity Dominion, Delahanty knew that such false statements were being communicated to Integrity Dominion through Barrett and Bakalov and relied upon by them.

180.    Delahanty thus had special knowledge of material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

181.    As a an officer, co-owner, and key high-level decision-maker for Lazy Deuce, Delahanty had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

34

182.   For these reasons, Delahanty had a special duty to disclose the falsity of such statements.

183.   He did not.

184.   **Kenneth Haglind (fraud by omission)**, as Lazy Deuce's CEO who was involved in the day-to-day coordination of the Ponzi scheme including the timing of Welliver's conflicted direction of Dblaine Fund's investments to repay Lazy Deuce's lenders and who was involved in various meetings discussing the same, knew that Semita was an empty pass-through, that Lazy Deuce's operations were hopelessly unprofitable and that Lazy Deuce could only repay its lenders with a continuous stream of new investments through its quid-pro-quo arrangement with Welliver, and was therefore a Ponzi scheme.

185.   Kenneth Haglind clearly knew that Lazy Deuce was not communicating the true nature of the Lazy Deuce-Dblaine scheme to Integrity Dominion because it is obvious that if Integrity Dominion would have been informed of the true Ponzi-scheme nature of the scheme, it would never have lent Lazy Deuce money.

186.   Kenneth Haglind had special knowledge of such material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

187.   As the CEO, co-owner, and as a high-level decision maker for Lazy Deuce, Kenneth Haglind had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

188.   For these reasons, Kenneth Haglind had a special duty to disclose the falsity of such statements to Integrity Dominion.

189.   He did not.

190.   **Steve Haglind (fraud by omission)**, as Lazy Deuce's Controller and signator who was involved in the day-to-day coordination of the Ponzi scheme including the timing of Welliver's conflicted direction of Dblaine Fund's investments to repay Lazy Deuce's lenders and who was involved in various meetings discussing the same, knew that Semita was an empty pass-through, that Lazy Deuce's operations were hopelessly unprofitable and that Lazy Deuce could only repay its lenders with a continuous stream of new investments through its quid-pro-quo arrangement with Welliver, and was therefore a Ponzi scheme.

191.   Steve Haglind clearly knew that Lazy Deuce was not communicating the true nature of the Lazy Deuce-Dblaine scheme to Integrity Dominion because it is obvious that if Integrity Dominion would have been informed of the true Ponzi-scheme nature of the scheme, it would never have lent Lazy Deuce money.

192.   Steve Haglind had special knowledge of such material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

193.   As the Controller and as a high-level decision maker for Lazy Deuce, Steve Haglind had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

194.   Steve Haglind therefore had a special duty to disclose the falsity of such statements to Integrity Dominion.

195.   He did not.

196.   **Bassinger (fraud by omission)**, as Lazy Deuce's chairman of the board who was involved in strategic coordination of the structure of the Lazy Deuce Ponzi scheme and who was involved in various meetings discussing the true nature of such scheme, knew that Semita was an empty pass-through, that Lazy Deuce's operations were hopelessly unprofitable and that Lazy Deuce could only repay its lenders with a continuous stream of new investments through its quid-pro-quo arrangement with Welliver, and was therefore a Ponzi scheme.

197.   Bassinger clearly knew that Lazy Deuce was not communicating the true nature of the Lazy Deuce-Dblaine scheme to Integrity Dominion because it is obvious that if Integrity Dominion would have been informed of the true Ponzi-scheme nature of the scheme, it would never have lent Lazy Deuce money.

198.   Bassinger had special knowledge of such material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

199.   As the chairman of the board, co-owner, and as a high-level decision maker for Lazy Deuce, Bassinger had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

200.   Bassinger therefore had a special duty to disclose the falsity of such statements to Integrity Dominion.

201.   He did not.

202.   **Cahill (fraud by omission)**, as a member of Lazy Deuce's board of directors and advisory board who was involved in various discussions and decisions regarding the true nature of the Lazy Deuce Ponzi scheme, knew that Semita was an

empty pass-through, that Lazy Deuce's operations were hopelessly unprofitable and that Lazy Deuce could only repay its lenders with a continuous stream of new investments through its quid-pro-quo arrangement with Welliver, and was therefore a Ponzi scheme.

203.    Cahill clearly knew that Lazy Deuce was not communicating the true nature of the Lazy Deuce-Dblaine scheme to Integrity Dominion because it is obvious that if Integrity Dominion would have been informed of the true Ponzi-scheme nature of the scheme, it would never have lent Lazy Deuce money.

204.    Cahill had special knowledge of such material facts regarding the true nature of the scheme to which Integrity Dominion did not have access.

205.    As the a member of Lazy Deuce's board of advisors and board of directors and as a high-level advisor and decision maker for Lazy Deuce, Cahill had a fiduciary relationship to Integrity Dominion as a lender to Lazy Deuce while it is was in a state of insolvency.

206.    Cahill therefore had a special duty to disclose the falsity of such statements to Integrity Dominion.

207.    He did not.

208.    The false representations and fraudulent omissions described herein were made or omitted to induce Plaintiff to enter into contracts with Lazy Deuce.

209.    Such representations and omissions caused Plaintiff to enter into contracts with Lazy Deuce, resulting in harm to Plaintiff.

210.   **Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill** share liability for the false representations and fraudulent omissions of the other Defendants because they **aided and abetted** each others' frauds.

211.   Baldwin, Johnson, and Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill knew that the other defendants were committing fraud against Integrity Dominion and substantially assisted each other in committing such fraud by the actions described herein.

212.   **Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill** also share liability for the false representations and fraudulent omissions of the other defendants because they acted as a **civil conspiracy** in a common fraud upon Integrity Dominion.

213.   Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill had a meeting of the minds regarding the true nature of the Lazy Deuce Ponzi scheme to defraud Integrity Dominion and committed unlawful acts including the frauds and breaches of contract described herein in furtherance of such scheme.

214.   **Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd Bassinger, and Jeff Cahill** also share individual liability for the false representations and fraudulent omissions made on behalf of Lazy Deuce, because Lazy Deuce is a mere facade for their scheme, meriting piercing of the corporate veil for the reasons described in additional detail above.

215.    Accordingly, Defendants have caused harm and are liable to Plaintiff in the

amount of at least $75,000, in an amount to be determined at trial, plus legal costs and

fees, as allowed by law.

### CLAIM III—Negligent Misrepresentation [WITHDRAWN]

### CLAIM IV—Deceptive trade practices under Minn. Stat. § 325D.44
### against all Defendants [WITHDRAWN]

### CLAIM V—Fraud in connection with the sale of securities
### under Minn. Stat. Chapter 80A
### against all Defendants [WITHDRAWN]

### CLAIM VI—Fraud in connection with the sale of securities
### under Section 10(b) of the Securities Exchange Act of 1934
### Against all Defendants [WITHDRAWN]

### CLAIM VII—Fraud in connection with the sale of securities
### under Section 12 of the Securities Act of 1933
### Against all Defendants [WITHDRAWN]

### CLAIM VIII—RICO Act, 18 U.S.C. §§ 1962, 1964
### Against against Lazy Deuce, Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve
### Haglind, Todd Bassinger, and Jeff Cahill

216.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth

herein.

217.    To further the fraudulent schemes described in this complaint, Defendants

continuously controlled and operated an enterprise engaged in a pattern of racketeering

activity, including wire fraud and mail fraud.

218.    Such enterprise and pattern of activity includes the participation of each of

Lazy Deuce, Baldwin, Johnson, Delahanty, Kenneth Haglind, Steve Haglind, Todd

Bassinger, and Jeff Cahill, as described in detail above, in the sophisticated Lazy Deuce

fraud scheme itself, conducted over at least the better part of a year, and the false statements and fraudulent omissions each made in furtherance of it.

219.    Such a sophisticated scheme by itself indicates a substantial history of engaging in such schemes and a likelihood of recidivism.

220.    In addition, as described above, in 2008, Baldwin and Delahanty were alleged in a federal complaint to have engaged in another highly sophisticated, big-money financial fraud in the Bright Dominion case.  This case reached a confidential settlement.

221.    Delahanty admits that he and Baldwin have been working together in similar activities since 2005.

222.    In addition, Baldwin attempted to recreate the Lazy Deuce model with "Stone Path Financial"; Delahanty and Hagen transferred Lazy Deuce operations and an actual Lazy Deuce borrower to a company called "Skyhawk Companies, LLC" continuing a similar business; and Johnson with the help of Bassinger, Cahill, and Steve Haglind continues to operate a labyrinthine structure of LLCs, which have generated at least six other civil lawsuits in this state against Johnson and various of his LLCs since the beginning of 2009.  These activities indicate the likelihood of the individual defendants running similar schemes going forward.

223.    Such enterprise was engaged in and affected interstate commerce.

224.    Such racketeering activity proximately caused Plaintiff to be defrauded of money and property and caused Defendants to receive income as principals of the

enterprise which was wrongfully used to benefit Defendants and invest in and further the
enterprise.

225.    Accordingly, Defendants have caused harm and are liable to Plaintiff in the
amount of at least $75,000, in an amount to be determined at trial, plus legal costs and
fees, as allowed by law.

### CLAIM IX—Fraudulent transfer under Minn. Stat. §§ 513.44 and 513.45 against all Defendants

226.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth
herein.

227.    Defendants transferred property with actual intent to hinder, delay, or
defraud Plaintiff as a creditor of Lazy Deuce.

228.    Defendants transferred property without receiving reasonably equivalent
value in exchange as described in the preceding paragraph and (1) Defendants were in
engaged in a business or transaction—its borrowing from Integrity Dominion—for which
the remaining assets of Lazy Deuce were unreasonably small in relation to the business or
transaction, and (2) Defendants intended to incur debts (to Integrity Dominion) beyond
Lazy Deuce's ability to pay or reasonably should have believed that such was the case.

229.    After incurring debt obligations to Plaintiff, Defendants transferred
property without receiving reasonably equivalent value in exchange, as described above,
making Lazy Deuce insolvent, or Defendant made such a transfer when Lazy Deuce was
already insolvent.

### JURY TRIAL DEMAND

42

230.    Plaintiff demands a jury trial.

**WHEREFORE**, Plaintiff requests an Order and Judgment against the Defendants as follows:

1.    Ordering judgment in favor of Plaintiff against Defendants, jointly and severally, in an amount greater than $75,000.00 to be determined at trial;

2.    Ordering that Plaintiff receive pre- and post-judgment interest;

3.    Ordering that Plaintiff receive treble damages;

4.    Ordering Defendants to reimburse Plaintiff for costs and disbursements, including attorney fees;

5.    Ordering that any person possessed of any interest in Defendants' racketeering enterprise or receiving funds as a result of fraudulent transfer disgorge any such interest; and

6.    For such other relief that the Court deems just and equitable.

Dated:  December 20, 2012            **THOMPSON HALL SANTI
CERNY & DOOLEY**


       s/Lucas J. Thompson
THOMPSON HALL SANTI CERNY
& DOOLEY
(TWIN CITIES LAW FIRM, LLC)
Lucas J. Thompson (#0345842)
Aaron D. Hall (#0387727)
901 Marquette Ave.
Suite 1675
Minneapolis, MN 55402
(612) 466-0010 Main
(612) 466-0070 Lucas Direct
(612) 437-4500 Fax

**ATTORNEYS FOR PLAINTIFF**

44