Integrity Dominion Funds, LLC,

                         Plaintiff,

v.

Lazy Deuce Capital Co., LLC, et al.,

                         Defendants,

v.

Jeff Hagen,

                         Third-Party Defendant.

Civ. No. 12-254 (RHK/JSM)

**MEMORANDUM OPINION AND ORDER**

Luke J. Thompson, Aaron D. Hall, Mark Santi, Twin Cities Law Firm, LLC, Minneapolis, Minnesota, for Plaintiff.

Robert M. Gardner, Gardner Law Office, Burnsville, Minnesota, for Defendant Brent Johnson.

## INTRODUCTION

Plaintiff Integrity Dominion Funds ("Integrity") loaned more than $3.5 million to Defendant Lazy Deuce Capital Co. ("Lazy Deuce") over the course of nine months. Lazy Deuce defaulted on some of the loans, and currently owes Integrity more than $1.5 million. After Lazy Deuce defaulted, Integrity commenced this action against it and several of its principals and their various corporate entities alleging that they were

operating a Ponzi[1] scheme.  One Defendant moves to dismiss certain of Integrity's claims, and for the reasons set forth below, his Motion will be granted in part.

## BACKGROUND

The following facts are alleged by Integrity in its Third Amended Complaint:

Integrity is a small private investment fund operated by three principals, Thomas Barrett, George Bakalov, and H. Chris Poole.  Lazy Deuce is an investment company owned and operated by Defendants Brent Johnson, Kenneth Haglind, Brian Baldwin, and Frank Delahanty III.  Delahanty also owns Defendant Semita Partners LLC ("Semita").

In fall 2010, Bakalov was put in touch with Baldwin, Johnson, and Delahanty through a friend who recommended investing in Lazy Deuce.  Defendants pitched Lazy Deuce to Bakalov and Barrett as a company that specialized in financing lawsuits and extending high-interest, short-term loans to businesses with "exotic" collateral—"the sort of hard-to-value collateral ordinary financial institutions would not touch."  Baldwin sent Barrett an example of a Lazy Deuce transaction, which was a $1 million loan to Dblaine Capital, LLC ("Dblaine"), a company owned by David Blaine Welliver.  The transaction was described as an SEC-approved asset purchase that would yield substantial interest and was secured by an "internal lien on the funds."  Baldwin and Johnson presented this transaction as an illustration of Lazy Deuce's investments, and they assured repayment of

---

[1] "In a Ponzi scheme, the operator promises investors returns on their investment which the operater intends to pay from funds provided by new investors, rather than from profits generated by the underlying business venture." In re Armstrong, 285 F.3d 1092, 1093 n.3 (8th Cir. 2002).  It takes its name from Charles Ponzi, who famously operated this type of fraudulent investment scheme.  See Cunningham v. Brown, 265 U.S. 1, 7 (1924) (describing Ponzi's scheme).

Integrity's loans would not depend on the success of Lazy Deuce's transactions with Dblaine.

Based on these and other representations, Integrity loaned Lazy Deuce $50,000 for 90 days at 5% monthly interest. Following prompt repayment of that loan, Integrity proceeded to make twelve more loans to Lazy Deuce between November 2010 and May 2011, totaling $3.6 million. The loans varied from thirty to ninety days in length and 3.5% to 10% monthly interest rates. Over the course of those months, Integrity's principals had several conversations with Defendants in which Defendants reiterated the security of Integrity's loans. They represented that Lazy Deuce's loans were secured by collateral worth several times the amount of its investments and could be easily liquidated and that Lazy Deuce had a large pool of reserve capital with which it could pay its investors. Integrity alleges that those and other representations were false.

By mid-summer 2011, Lazy Deuce had defaulted on over $1.5 million in payments to Integrity. Integrity alleges that Lazy Deuce never had a profitable investment strategy and that Defendants knew it. Integrity alleges it and other investors loaned money to Lazy Deuce at 3% to 4% monthly interest and Lazy Deuce, in turn, loaned money to Dblaine at 15% to 18% annual interest (1.5% or less monthly interest)— an inherently losing investment strategy. As a condition of Lazy Deuce's loans to Dblaine, the Dblaine Mutual Fund (another entity controlled by Welliver) would make quid-pro-quo investments in Semita, a company owned by Delahanty. Semita then funneled the money to Lazy Deuce, which used it to repay investors.

In 2012, Integrity filed the instant action against Lazy Deuce, Semita, Baldwin, Delahanty, Johnson, Haglind, and others asserting eleven claims. Integrity has since amended its Complaint twice and settled with most Defendants. Its remaining claims allege breach of contract (Count I), fraudulent misrepresentation (Count II), and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count VIII) and the Minnesota Fraudulent Transfer Act ("MFTA") (Count IX). One of the three remaining Defendants, Johnson, moves to dismiss Integrity's claims.[2]

## STANDARD OF DECISION

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 547. A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any

---

[2] The other remaining two Defendants—Lazy Deuce and Baldwin—have not yet answered or moved.

allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. Twombly, 550 U.S. at 554–56. A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. Id. at 556. Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely. Id. "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

**ANALYSIS**

**I. RICO**

Integrity asserts a RICO claim against all Defendants. Under RICO, it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

Only certain unlawful acts qualify as "racketeering activity" under RICO, which are known as "predicate offenses" or "predicate acts." Integrity alleges that Defendants violated RICO by engaging in mail and wire fraud, which constitute predicate acts under RICO and therefore may provide the basis for a RICO claim. Mail and wire fraud are distinct from and "much broader" than common-law fraud and they do not require a showing of factual misrepresentations. Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 991 (8th Cir. 1989). Instead, a plaintiff must allege the defendant was involved in a plan or scheme to defraud, that it was foreseeable that the defendant's scheme would

cause the mail or wire communications to be used, and that the mail or wire communications were used for the purpose of carrying out the fraudulent scheme.  See id.; 18 U.S.C. §§ 1341, 1343.  Johnson does not dispute that Integrity has properly alleged each of these elements.

Johnson challenges instead whether Integrity has sufficiently alleged a "pattern" of such activity, rather than mere instances of it.  To establish a pattern under RICO, Integrity must allege Johnson's predicate acts of mail or wire fraud were related and that they amount to, or pose a threat of, *continuing* criminal activity.  H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).  This continuity requirement may be met by showing either (1) "a series of related predicates over a substantial period of time," id. at 242, or (2) "past conduct that by its nature projects into the future with a threat of repetition," id. at 241.  Integrity alleges Johnson's conduct qualifies as continuing criminal activity under both definitions; the Court concludes it does not qualify under either.

First, Integrity alleges the pattern of racketeering activity was the "Lazy-Deuce/Dblaine/Semita scheme" to "defraud Integrity."  But Integrity's relationship with Lazy Deuce and Defendants lasted fewer than nine months.  And, Integrity has alleged very few uses of the mail or wire communications as part of the scheme during that time—only three emails, all of which were transmitted within a period of three months. (See Pl.'s Mem. in Opp'n at 31–32; Third Am. Compl. ¶¶ 35, 48, 61 (alleged misrepresentations sent by email on November 8, 2010, January 11, 2011, and January

31, 2011).)[3]  This alleged scheme was much too brief to constitute a "pattern" of activity under RICO.  See Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1215 (8th Cir. 1993) (alleged scheme lasting ten or eleven months was too brief to support a RICO claim).  In the alternative, Integrity alleges Defendants were involved in a larger scheme of investment-related fraud, spanning several years.  In support of this argument against Johnson, it points to the following allegations in its Complaint:  (1) Johnson boasted about keeping large amounts of valuables in safes and having hidden assets (id. ¶¶ 46–47); (2) Johnson continues to operate other businesses employing various Defendants (id. ¶¶ 10–12); and (3) Johnson and his businesses have been named in at least six other lawsuits since 2009 (id. ¶ 222).  But none of these allegations encompasses the elements of mail or wire fraud and therefore none bolsters Integrity's RICO claim.[4]  Integrity must allege facts indicating a pattern of *racketeering activity* specifically, not fraudulent activity generally.

Finally, Integrity alleges that even if the alleged fraudulent scheme did not span a substantial period of time, it "by its nature projects into the future with a threat of repetition."  But all parties acknowledge Lazy Deuce is defunct and Integrity has not

---

[3] In its Memorandum, Integrity claims that Lazy Deuce also had a website, but that allegation does not appear in the Third Amended Complaint.  (See Pl.'s Mem. at 31.)

[4] The Court treated these same allegations differently in its Order disposing of Johnson's Motion to Dismiss the First Amended Complaint (see Doc. No. 29 at 11–12), but after further consideration and additional briefing on the issue, the Court now arrives at a different conclusion.  See Lovett v. Gen. Motors Corp., 975 F.2d 518, 522 (8th Cir. 1992) ("The district court has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment.").

pleaded sufficient facts indicating that Johnson has since continued the scheme or mail or wire fraud under a different guise.[5] Therefore, this argument is unavailing.

Because Integrity alleges a scheme of mail or wire fraud occurring over nine months at most, it fails to state a claim under RICO against Johnson.

## II. Subject-Matter Jurisdiction

The Court's subject matter jurisdiction in this action stems from Integrity's federal RICO claim, over which the Court has original jurisdiction. Because Integrity's other (state-law) claims derive from the same series of statements and transactions as its RICO claim, the Court may exercise supplemental jurisdiction over those claims. See Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (For a federal court to have jurisdiction over both state and federal claims, they "must derive from a common nucleus of operative fact." In other words, "[if] a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then . . . there is power in federal courts to hear the whole."). Given that the Court will dismiss Integrity's RICO claim against Johnson, he argues that the Court should decline to exercise supplemental jurisdiction over the state-law claims pending against him and dismiss him from the suit. See 28 U.S.C. § 1367(c) (A court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction.").

---

[5] Integrity does allege that Delahanty has "transferred Lazy Deuce operations and an actual Lazy Deuce borrower" to another company of his and is "continuing a similar business." But such general allegations of a continuing fraud are insufficient. See Fed. R. Civ. P. 9(b); Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995) (applying Rule 9(b) to RICO claim predicated on mail and wire fraud).

To decide whether the continued exercise of supplemental jurisdiction is proper, the Court balances factors such as judicial economy, convenience, fairness, and comity. Gibbs, 383 U.S. at 726; Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 (1988). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n.7. But this is not the "usual" case. Integrity asserted its federal and state claims against all three remaining Defendants, yet only one Defendant has moved to dismiss. Hence, not all of Integrity's federal claims have been dismissed because its RICO claim remains pending against Baldwin and Lazy Deuce.

The court in Armstrong v. American Pallet Leasing, 678 F. Supp. 2d 827, 844 (N.D. Iowa 2009), confronted this same procedural posture—the plaintiff's RICO claim was dismissed against moving defendant but not co-defendants and the plaintiff's state-law claims remained against moving defendant and co-defendants. Under such circumstances, the court in Armstrong determined the relevant factors weigh in favor of retaining jurisdiction and this Court agrees with its conclusion. First, retaining jurisdiction promotes judicial economy because it "avoids the appreciable problem of parallel lawsuits in state and federal court and avoids duplication of work and the resulting dissipation of judicial resources." Id. at 848. Second, retaining jurisdiction is most convenient for the parties because it allows "near identical claims [to be] resolved in a single forum." Id. Finally, "the court's investment of judicial time and resources expended in the case weighs in favor of retaining supplemental jurisdiction." Id. Having

determined that the exercise of supplemental jurisdiction is appropriate, the Court will address Johnson's Motion on Integrity's state-law claims.

## III. Fraudulent Misrepresentation

Integrity brings fraud claims against all Defendants, citing numerous statements and omissions and employing multiple theories: "direct" misrepresentation, misrepresentation by omission, and aiding and abetting others' misrepresentations.

### A. Affirmative Misrepresentation

To state a claim for fraudulent misrepresentation under Minnesota law, a party must allege (1) a false representation or material fact, (2) made with knowledge of the falsity or without knowing whether it was true, (3) with the intention to induce another's reliance thereon, and that (4) the plaintiff relied on the representation and (5) suffered pecuniary damage as a result. Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986). Integrity alleges that Defendants knowingly misrepresented material facts regarding the nature, operations, and funding of Lazy Deuce's business and that it relied on those misrepresentations when deciding to loan money to Lazy Deuce and lost its investments as a result.

Specifically, Integrity alleges that Johnson represented the following facts, all of which were false: repayment of Integrity's loan would not depend on the success of Lazy Deuce's investment in Dblaine Capital; Lazy Deuce's investment in Dblaine was secured by collateral worth $7 million; Lazy Deuce's investments earned 5% interest per month; Lazy Deuce always secured its investments with collateral worth multiple times its investment; Lazy Deuce had collateral in gold in one of its investments; Lazy Deuce had

- 10 -

turned $10,000 into $600,000 by financing Converse tennis shoes' bankruptcy claim and that such a deal was typical of Lazy Deuce's business. (Third Am. Compl. ¶¶ 41–42, 59, 78, 84.)

### 1. Pleading with Specificity

Johnson argues that Integrity did not meet the heightened pleading standard for fraud claims under Federal Rule of Civil Procedure 9(b). Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To meet this standard, a party is generally required to allege the "who, what, where, when, and how" of the alleged fraud. United States ex. rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006). Upon examination of the Complaint, the Court concludes that Integrity has pleaded its claim with requisite specificity with regard to some, but not all, of Johnson's alleged statements. Integrity specifically alleges that Johnson's latter three statements (regarding Lazy Deuce's collateral and its investment in Converse's bankruptcy) took place on March 10, 2011, at a meeting involving Barrett, Bakalov, Baldwin, Johnson, Delahanty, and Hagen, thus providing the who, what, when, and where needed to overcome Rule 9(b). The allegations regarding Johnson's former three statements (regarding Lazy Deuce's investment with Dblaine Capital and its 5% interest rate), however, do not pass muster. Integrity does not allege a time, place, or even method of communication for these purported statements, and as such they do not provide Johnson adequate notice of the allegations against him. See id. (Rule 9(b)'s particularity requirement is "'intended to enable the defendant to respond specifically and

quickly to the potentially damaging allegations [against him].") (quoting United States ex. rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003)).

    *2. Reasonable Reliance*

Johnson also argues that Integrity's claim should be dismissed because its alleged reliance on his statements was not reasonable. They argue that Integrity was not entitled to rely on his representations because they were "directly contradicted by written documents disclosing the accompanying 'risks' pertaining to Plaintiff's investments." (Johnson's Mem. at 6 (citing Third Am. Compl. ¶¶ 49 & 54; id. Exs. D & E).) Specifically, they point to "executive summaries" of specific investment opportunities with Lazy Deuce, which contain a paragraph addressing "Risks," stating: "An investment of this type represents a high degree of risk, including the risk of loss of an investor's entire investment." It is true that, as a matter of law in Minnesota, it is unreasonable to rely on oral representations completely contradicted by a written agreement. Teng Moua v. Jani-King of Minn., Inc., 810 F. Supp. 2d 882, 890 (D. Minn. 2011) (Montgomery, J.). But these executive summaries were not written agreements between the parties and they did not contradict Johnson's alleged misrepresentations.

Most of the alleged misrepresentations were facts pertaining to the nature and security of Lazy Deuce's business, such as the types of investments it makes and the amount of cash and collateral it holds. These factual representations regarding its business model are not contradicted anywhere in the executive summaries, and certainly not by their general disclaimer of "risks." Even alleged misrepresentations regarding the risk of Integrity's investments are not directly contradicted by these executive summaries.

- 12 -

The summaries describe *examples* of investment opportunities with Lazy Deuce; there is no allegation they describe the terms of Integrity's *actual* investments. The only "written agreements" between the parties delineating the terms of Integrity's investments were the promissory notes executed by Lazy Deuce. And those did not contain any disclaimer of risk, let alone contradict the many alleged misrepresentations about Lazy Deuce's business model. The Court cannot conclude that Integrity's alleged reliance on Johnson's representations regarding the nature of Lazy Deuce's business and the security of Lazy Deuce's (and Integrity's potential) investments was unreasonable as a matter of law.

### B. Fraud by Omission

Integrity alleges that Johnson knew that various Defendants were making false statements to Integrity, which Integrity was relying upon, and had a duty to disclose this to Integrity, either because he had a fiduciary relationship to Integrity or because he had special knowledge to which Integrity did not have access.

"As a general rule, one party to a transaction has no duty to disclose material facts to the other." Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 622 (Minn. 1972). "But a duty to disclose may arise if the parties stand in a fiduciary relationship or if one party 'has special knowledge of material facts to which the other party does not have access.' If a party conceals these facts, 'knowing that the other party acts on the presumption that no such fact[s] exist,' nondisclosure *may* constitute fraud." Driscoll v. Standard Hardware, Inc., 785 N.W.2d 805, 812 (Minn. Ct. App. 2010) (quoting Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976)) (citations omitted) (emphasis

added). But courts are "reluctant to impose a duty to disclose material facts in arm's-length business transactions between commercial entities." Id. at 813.

The question then is whether Johnson had a duty to disclose his knowledge of the other Defendants' misrepresentations. While the Court is doubtful whether the parties were in a fiduciary relationship, Johnson may have nonetheless had a duty to disclose by virtue of his "special knowledge" of material facts to which Integrity did not have access. On this point, the Court finds Grace Capital, LLC v. Mills, No. A09-1857, 2010 WL 3396817, at *1–2 (Minn. Ct. App. Aug. 31, 2010), particularly instructive.[6] The defendant in Mills personally guaranteed a loan his company received from the plaintiff investment fund. Id. at *1. Unbeknownst to him, the fund was also financing a company operating a Ponzi scheme. Id. His company defaulted on the loans, and the fund initiated an action against him to recover the amounts due. Id. at *2. In defense to the action, he alleged that the fund knew it was financing a Ponzi scheme (because the fund and the scheme shared principals) and fraudulently induced him into the transactions in order to mitigate its financial difficulties caused by the Ponzi-scheme client. Id. The Court concluded that the defendant's allegations (coupled with supporting affidavits) "raised a colorable argument that the [fund] owed [him] a duty of due care to disclose material

---

[6] While the facts of Mills are certainly distinct from the facts of this case, the Court finds it a more apt comparison than the slew of cases the parties cite addressing the fiduciary duty of a bank to disclose the fraud or insolvency of one client to another. See, e.g., Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455 (8th Cir. 2013); Boublek v. Liberty State Bank, 553 N.W.2d 393 (Minn. 1996); Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648 (Minn. 1976).

facts relating to the [Ponzi scheme client], and a corresponding duty to say enough to prevent misleading [him] in his decision to guarantee the notes." Id. at *6.

Integrity's allegations are similar to the defendant's allegations in Mills. Both allege they would not have lent or borrowed money, respectively, had the other party to the transaction disclosed the fraud and financial difficulties going on behind the scenes. As such, the Court follows the lead of the Minnesota Court of Appeals and concludes that Integrity has alleged a colorable claim of fraudulent nondisclosure against Johnson.

## IV. Breach of Contract and Piercing the Corporate Veil

Integrity seeks to hold individual Defendants liable for Lazy Deuce's alleged breach of contract. Under Minnesota law, a court may, under limited circumstances, "pierce the corporate veil" and hold a corporation's owner or officer liable for the acts of the corporation. See Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979). Victoria Elevator sets out a two-prong test for determining whether to pierce the corporate veil. The first prong consists of eight factors to be considered regarding the financial state and proper functioning of the corporation, each of which Integrity has alleged. (See id.; Third Am. Compl. ¶ 149.)

The second prong asks whether the party seeking to pierce the corporate veil has established that doing so is necessary to avoid "an element of injustice or fundamental unfairness." Id. As to this prong, Integrity has alleged that Defendants were using Lazy Deuce and Semita to operate a Ponzi scheme, of which Integrity was a victim. Integrity has adequately alleged a Ponzi scheme, outlining in substantial detail the alleged flow of funds in its Complaint. And where, as here, a plaintiff alleges that the corporate form

was being used to perpetrate a fraud, "courts may disregard the corporate entity and permit plaintiff[] to 'pierce the corporate veil.'" Stone v. Jetmar Props., LLC, 733 N.W.2d 480, 488 (Minn. Ct. App. 2007); see Cirrus, Inc. v. Whitney, No. A09-2107, 2010 WL 3463616, at *6 (Minn. Ct. App. Sept. 7, 2010) (defendant's fraudulent scheme utilizing various corporate entities warranted personal liability). Indeed, that is precisely when a court *should* pierce the corporate veil—there is nothing more fundamentally unfair than to allow a person to cloak himself in the legitimacy of the corporate form in order to defraud people and then allow him to raise that corporate form as a shield against any personal liability for such wrongdoing. Accordingly, the Court concludes that Integrity has stated a plausible claim for breach of contract, by way of piercing the corporate veil, against Johnson.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Johnson's Motion to Dismiss (Doc. No. 79) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)  The Motion is **GRANTED** as to Count VIII of the Third Amended Complaint (Doc. No. 53), and that claim is **DISMISSED WITH PREJUDICE** against Defendant Brent Johnson.

(2)  The Motion is **DENIED** as to all other Counts.


Dated:  July 12, 2013

        s/Richard H. Kyle
        RICHARD H. KYLE
        United States District Judge